(No. 2777—

CHARLES HAMILTON, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed April 11, 1940.*

JOSEPH W. KOUCKY, for claimant.

JOHN E. CASSIDY, Attorney General; GLENN A. TREVOR, Assistant Attorney General, for respondent.

MR. JUSTICE LINSCOTT delivered the opinion of the court:

Charles Hamilton has made a claim against the State of Illinois for compensation to be awarded him pursuant to the Workmen's Compensation Act, on account of an injury which he received. Claimant states that he resides at the Chicago State Hospital, 6400 Irving Park Boulevard, Chicago, Illinois; that on the 2nd day of February, 1935, and for several years prior to that date, he was employed by the State of Illinois as an employee of the Chicago State Hospital, as a

landscape gardener; that his duties, among other things, were to look after the lawn, shrubs, etc., and in other ways assist in the maintenance of the grounds of the Chicago State Hospital.

Claimant further charges that while he was working for the Chicago State Hospital, in the City of Chicago, on the date last mentioned, and while in the discharge of his duties, he slipped and fell on the ice, and as the result of the fall he sustained injuries to his left shoulder and arm. (The proof and subsequent amendments to the complaint show this to be the right shoulder.)

Claimant also alleges that notice was given of the accident on or about the same day, and that medical and surgical services were furnished and paid for by the State of Illinois. Claimant's compensation was alleged to be $58.00 per month, exclusive of board, room and laundry service, and that his average annual earnings for the year preceding the injury, including board, room and laundry, were $1,200.00. He also alleges that he has not received any compensation on account of said injury, except his regular monthly salary and maintenance for eight weeks, that being the period of temporary disability, and he asks for an award under Section 7 of the Illinois Workmen's Compensation Act.

The proof shows that in 1912 the claimant suffered the amputation of his right hand at about the wrist on account of a shot-gun wound and blood poisoning.

As we construe the proof in the record, he suffered as the result of the injury complained of, fifty per cent loss of the use of his right arm independent of the amputation; that after the amputation and before his injury, he did have considerable use of this arm. He could carry many things by holding them tight to his body and by the use of a hook upon the wrist, he was able to do a number of things. The evidence further discloses that the present condition of his arm is permanent.

At the time of the injury, claimant was working with eight or nine men, presumably inmates of the hospital, and two of them got into trouble. Claimant tried to separate them and in so doing, his right shoulder was broken. Some of these patients are mentally deranged and it was a part of the claimant's duty to maintain order. Claimant was treated at the hospital at the expense of the State. He testified that

he was treated for six or seven weeks, but the more convincing evidence is that he was back to work in thirty-two days.

Claimant was injured on February 2, 1935. During the year preceding the accident, for two months he received $50.40, for six months $48.60 and for four months $46.80. At the time of the accident his salary was $50.40. It was stipulated that the annual salary for the year next prior to the injury amounted to $795.60 and that the average weekly wage for that period was $15.30 per week.

Claimant lost thirty-two days work on account of the injury. He was in the hospital twenty-six days and it was six days more before he returned to work. Apparently it was a bad fracture and when it healed the arm and shoulder were somewhat stiffened and there was a loss of limitation of 45 to 50%.

The claimant stated that he had received $18.00 per month maintenance and upon that statement, together with the departmental report, it was stipulated between the parties that his salary or wages for the year immediately preceding his injury amounted to $795.60, or an average weekly wage of $15.30. During the thirty-two days that claimant was totally temporarily disabled, he received his full salary on the basis of $50.40 wages and $18.00 commutation, or a total of $68.40 per month, or a total of $72.96 for thirty-two days. Based on the rate of pay for the year immediately prior to the injury, the claimant was entitled to a compensation rate of $7.65 per week for a period of four weeks and four days. This would amount to $34.97. The claimant was therefore, overpaid the sum of $37.99, and this amount should be deducted.

Plaintiff had, prior to this injury, lost the use of his right arm by amputation at the wrist. Both Dr. Adams and Dr. Bell testified, and the prior loss of the hand is admitted.

Section 17½ of the Compensation Act provides as follows:

"In computing the compensation to be paid to any employee who, before the accident for which he claims compensation, had before that time sustained an injury resulting in the loss by amputation or partial loss by amputation of any member, including hand, arm, thumb or fingers, leg, foot, or any toes, such loss or partial loss of any such member shall be deducted from any award made for the subsequent injury, and for the permanent total loss of use or the permanent partial loss of any such member or the sight of an eye shall be deducted from any award made for the subsequent injury, and for the permanent total loss of use or the permanent partial loss of use of any such member for which compensation has been paid, then such

loss shall be taken into consideration and deducted from any award .for the subsequent injury."

The record discloses that the claimant did not receive any compensation for the loss of the hand, and he now contends that for that reason an award should be fixed at the same amount as it would have been had the hand been lost as the result of the accident in question.

Prior to the amendment of the Act by the addition of Section 17½ that was the interpretation of the law by the Supreme Court, but we regard the law as now amended as having been amended to prevent a recovery of more than a one hundred per cent loss of an arm, hand, leg, etc., in cases of this kind. As we construe Section 17½, it means that we must take into consideration the permanent partial loss of use of any such member or the permanent total loss of use, and deduct that amount from any reward for the subsequent injury. The question does not depend upon whether or not compensation has been paid, but depends upon whether or not there has been a loss or partial loss by amputation of any member, including arm, hand, thumb, etc., and if such a loss has taken place then the amount which was paid or should have been paid under the Compensation Act must be deducted.

If claimant had suffered the complete loss of his arm, he would have been entitled to 50% of his average weekly wages during 225 weeks, but we cannot allow anything for the loss of the hand because that occurred at another time and at another place, and for the loss of a hand, the statute fixes the amount at one-half of the average weekly wage for 170 weeks. Deducting this 170 weeks from the 225 weeks, we have 55 weeks left, but the proof shows that he only suffered a loss of 50% of the use of the remaining part of the arm. He would, therefore, be entitled to one-half of 50% of his average weekly wage for 55 weeks, or $210.38, less the $37.99, which he was overpaid, or the sum of $172.39.

We, therefore, make an award in favor of the claimant in the sum of $172.39.

This award being subject to the provisions of an Act entitled "An Act Making an Appropriation to Pay Compensation Claims of State Employees and Providing for the Method of Payment Thereof," (Illinois Revised Statutes, 1939, Bar Assn. Edition, Chapter 127, Pars. 180-181), and

being subject also to the terms of an Act entitled "An Act Making Appropriations to the Auditor of Public Accounts for the Disbursement of Certain Monies Until the Expiration of the First Fiscal Quarter After the Adjournment of the Next Regular Session of the General Assembly," approved July 1, 1939 (Session Laws 1939, page 117); and being by the terms of the first mentioned Act, subject to the approval of the Governor, is hereby, if and when approval is given, made payable from the appropriation from the General Revenue Fund in the manner provided by the foregoing Acts.